Wanamaker, J.,
concurring. Four of the members of this court agree on this judgment. We disagree, however, as.to the routes of reason by which the judgment isi arrived at. The importance of the question to the .public, no less than the amount involved to the telephone companies, justifies ' at least a brief statement setting forth the grounds for my concurrence.
The full statement made by the Chief Justice in his opinion renders unnecessary more than a brief reference to such facts as become pertinent in my view of the case.
A franchise contract with the telephone company was entered into by the municipality in 1899 for the period of 25 years. In 1914, under a provision of the public utilities statutes, application was made for a merger of certain companies, which merger was allowed, pursuant to the statute, but no order was made changing or attempting to change the franchise rates theretofore existing. The public utilities commission, however, pretended to expressly reserve, such authority under the provisions of the statute.
Thereafter, an application was made to the public utilities commission to increase the telephone rates beyond the franchise ordinance rates, in accordance with a certain schedule filed by the telephone company with the commission, to which objectiohs were duly made, on the ground, among others, that the commission was without constitutional authority to *128 act by reason of the said 25-year franchise ordinance contract being in full force and effect.
The public utilities commission finally made an order substantially changing the former telephone rates under the ordinances of the municipality, by increasing them. Error is prosecuted by the municipality to reverse that decision. '
The leading question therefore is whether or not such alterations, or change in franchise contract rates, made by the public utilities commission under color and authority of one of the sections of the public utilities statutes, is an exercise of constitutional power under the national constitutional provision, Section 10, Article I, which reads:
“No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque or Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility.”
It will be observed that this section denies the exercise of certain powers upon the part of the state, or any of the agencies of the state, and that that denial of power is expressly made in the national constitution. The particular power here denied to the state, involved in this case, is that no state shall pass any “Law impairing the Obligation of Contracts.”
This is a plain provision of the people’s constitution. The language of the law, the organic constitutional law, is direct. There is nothing doubtful about it. We know what a contract is. We *129 know what the obligation of a contract is. Possibly the word “impair” is somewhat unusual. Webster’s International Dictionary defines it thus, “To make worse; to diminish in quantity, value, excellence, or strength; to deteriorate,” and gives the following synonyms: “Diminish, decrease, deteriorate, reduce, weaken, enfeeble.”
Certainly to wholly destroy an obligation is' to diminish that obligation, or “impair” that obligation. If to destroy part of it is to diminish it or “impair” it, surely to destroy all of it woüld be of like legal or constitutional effect.
In the business world nothing should be more sacred than the inviolability of contracts; their integrity and the integrity of all parties thereto. Confidence is necessarily the cornerstone of all commerce, and it will not do to hold compacts between individuals or individuals and the public, or even between nations, as “mere scraps of paper.” The kaiser provoked á world war because the contracts and obligations resulting from a solemnly entered treaty imposed no obligation upon him. On the other hand, Belgium was to be invaded, without any cause or provocation upon its part, merely because treaty rights and obligations and contracts were to be henceforth treated as “mere scraps of paper.”
With like effect contracts involving millions and billions of dollars in the business world have been cancelled, impaired, destroyed, because somebody’s profits were affected thereby. The obligation of a contract is as evanescent as temperament, and *130 seems to be determined not by considerations of conscience, but by considerations of profit. Our patriotism in protecting our constitution must not be spelled “paytriotism.”
But it is claimed that this franchise ordinance contract entered into in 1899 was not a valid obligation between the telephone company and the municipality.
After fifteen years of operation under the contract by both sides, each carrying its respective burdens and taking its respective benefits under the same, it would be an exceedingly doubtful policy to permit either party to complain of the invalidity, while still holding the benefits under the contract. Some things are so obviously unjust-, illegal, and unconscionable, that no argument is necessary to prove them.
Under the old common law, for centuries, when a community became a public corporation, agreeable to law, one of the first powers with which it became endowed was the power of contract. Indeed it would not be a corporate entity to any purpose without that power.
I am fully aware that Farmer v. Columbiana County Telephone Co., 72 Ohio St., 526, holds the contrary. A reading of the opinion in that case discloses neither reason nor authority to support the proposition, especially in view of the common-law power of every corporation. Though that decision still stands unreversed it cannot overturn by mere dictum the old established common-law doctrine, which has become settled as the law of the *131 land. That decision has not yet become stare decisis in Ohio, though written by one of the most eminent judges of our supreme court. The common-law principle of power of contract vested in every municipality with regard to its municipal and proprietary functions is inherent, and is the very life of the corporation, except as it may be limited by state or national constitution.
Judge Thurman, in his very able opinion in the old case of Cass v. Dillon, 2 Ohio St., 607, holds exactly contrary to the Farmer case, supra, and at page 622 supports the same by authoritative and historic statement of facts and principles, in the following words:
“Again: The constitution did not create the municipalities of the state, nor does it attempt to enumerate their powers. It recognizes them as things already in being, with powers that will continue to exist, so far as they are consistent with the organic law, until modified or repealed. Thus there is no express provision that a county may make a road or contract a debt, yet no one will doubt for a moment that it may do both. Indeed, its power to contract debt is recognized, -beyond even the authority conferred by law. It is clearly assumed in section 5 of article 8, that it may create debts to repel invasion, suppress insurrection, or defend the state in war, although no such power has ever been conferred by statute, so far as I can discover. If it can thus incur debts, it may, of course, levy taxes to pay them; notwithstanding its-only express grant of the taxing power is, by section 7 of article 10, for ‘police purposes,’ The *132 same thing may be said of townships, cities, towns, and villages
But, it may be said that what we have under, consideration here is not a “law,” because not an act of the general assembly, the legislative brahch, whose action is necessary to pass a law as ordinarily viewed; that it is, after all, only an “order” of the public utilities commission.
I think it will be readily conceded that the legislature can not pass an act directly nullifying these franchise ordinance contracts. May the legislature, nevertheless, create a' commission and authorize such commission to nullify such ordinance contracts, even upon hearing and notice to all parties, so long as either party to the contract objects? It is elementary, that what the legislature may not do directly as principal, it may not do indirectly through its agents. To hold otherwise, would be to make our constitutional provisions the playthings and shuttlecocks of the politicians and profiteers, and would reduce them to such a state of confúsion and chaos that the public could not know what the law was until the supreme court had passed on each and every controversy.
The legislature cannot create an agency, board or commission to do an act which the constitution says that the principal may not do. However, the denial is not an express one to the legislature; it is, upon the other hand, an express denial to the state, and it is the state that is acting through the public utilities commission as one of its governmental agencies. Therefore the power granted to the public utilities commission, however solemnly vested, or *133 pretended to be vested by the general assembly of Ohio, is null and void, because prohibited by our Federal Constitution.
I am quite aware that there are decisions to the contrary, decisions that take the people’s plain provisions of their own organic law and give them a twist and technical squint till they become substantially meaningless. Be it remembered, however, that the constitution was not made by judges, nor for the judges. It was made by the people, for the people, through their representatives. Presumably it expresses in general, germane terms the sense of the whole people, and is not to be perverted so as to express the sense or financial interest of any mere group.
John Marshall, who rarely cited a case as an authority to sustain a principle, but rather declared and demonstrated the sense and soundness of the principle, and its application to the case at bar, laid down this fundamental doctrine of constitutional interpretation in Gibbons v. Ogden, 9 Wheat. (22 U. S.), 1, at page 188:
“As men whose intentions require no concealment, generally employ the words which most directly and aptly express the ideas they intend to convey, the enlightened patriots who framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what thev have said.”
As a corollary to this proposition regarding the use of broad general terms, so characteristic of constitutions, Judge Ranney, in his dissenting *134 opinion in Cass v. Dillon, supra, at page 634, uses this language, clear, and commendable in all constitutional construction: “This case, throughout, furnishes another and forcible illustration of the absolute necessity * * * of comprehending, clearly, the spirit and object of the provision, and of holding that cases within its equity are included within it, and governed by it.”
He then continues':
“If this be true of statutory enactments, how eminently so of constitutional provisions, necessarily expressed with brevity, and designed to declare great principles in the fewest possible words. To the judicial tribunals belongs the duty of applying-these principles to individual cases; * * * the polar star to guide the judicial mind, should be the object intended to be accomplished by the provision ; and it should be so construed as to preserve this in full vigor, unimpaired by evasion, although in doing so the letter may not be strictly adhered to.”
Too much legal ingenuity is today employed in advising clients how to do a perfectly unlawful thing in a prima facie lawful way, and in advising courts to do a perfectly unconstitutional thing in a prima facie constitutional way. Whether or not such sophistry shall succeed depends upon whether the' courts shall regard the substance of things, or merely the surface of things.
It is self-evident that the thing aimed at by the federal constitutional provision, in declaring against the impairment of the obligation of contracts, is to prevent repudiation in whole or in part *135 of any such obligation; and any act, order or law, by the state or any of its agencies, that effects such impairment, is clearly and conclusively prohibited, and therefore unconstitutional.
Not very long ago the great corporate interests of the country were the loudest and longest in defending the sacredness of this provision of the constitution; but as profits began to diminish they temporarily reversed their position in this behalf, and are now pleading that this former sacred provision is meaningless as against the police power.
The absurd position that the police power under our- constitution is above and beyond other provisions of the constitution is too ridiculous to admit of any argument. It is self-evident that police power represents more than 90 per cent, of all governmental power. Eliminating the power of taxation and the power of eminent domain, little remains of government but the police power, in one form or another, and to hold that constitutional limitations are not restraints upon police power, the same as upon any other governmental power, is to open wide the doors of government toward the supremacy of the autocrat, toward irresponsible government, and un-American government, and to make a mere scrap of paper of our constitutions.
Police power is a much-abused term. It is not found in the Declaration of Independence, the Federal Constitution, or our State Constitutions. It is a judicial invention, and because of its great dimensions, limited only by the constitutions, courts have refused to define it. with exactness or precision. It is probably best represented as Uncle *136 Sam, the policeman, exercising the great governmental power of policing the people so as to preserve their powers and privileges, their rights and liberties, as recognized, limited and guaranteed by our constitution.
The police power is all represented within the popular provision obtaining expressly in nearly all the state constitutions, and by implication in our national constitution, that “All political power is inherent in the people.” Of course this includes police power as well as every other power, and when the people delegate that power, or deny that power to any governmental agency, such delegation or denial must by its very nature be either exclusive or paramount, which in practical effect are substantially synonymous.
Now Section 10, Article I of the Constitution of the United States, is of necessity, a limitation upon ithe police power of the state, as well as upon every other governmental power of the state. If the fathers had meant it otherwise, it is to be presumed they would have clearly so said. It is therefore immaterial what purpose the law which seeks to impair that obligation may be designed to serve. It is immaterial that it may have some pretended benevolent purpose, or that it is designed- to be a so-called emergency. If it impairs the obligation, that is enough to make it unconstitutional.'
But it is urged that this public utility service is a matter so affected by public interests that the public are not bound by this constitutional limitation. But the people are bound by constitutional limitations no less than the individual, and the bonds and *137 bounds of the constitution cannot be set aside by any less authority than the power that made them.
My second reason for concurring in this judgment is that the public utilities act of 1911', passed one year before the new constitutional amendments of 1912, is subordinated necessarily to the later constitutional amendments, especially Sections 3, 4 and 5, Article XVIII of the Ohio Constitution.
The sovereign people of the state by direct grant in the Constitution of 1912 gave the sovereign people of tlie city not only “all powers of local self-government,” as provided in Section 3, Article XVIII, but also the more particular specific “power to contract” for the “product or service” of public utility corporations.
This is the first appearance of this provision 'in Ohio constitutions, and it appears nowhere else, either expressly or impliedly, than in the article dealing with municipal corporations.
I hold that this express grant from the sovereign people of the state to the .sovereign people of the municipalities is clearly and conclusively an exclusive grant, which neither the legislature nor any other branch of the government may ignore, alter or modify.
One of the latest cases dealing with this 18th Amendment is that of City of Elyria v. Vande-mark, 100 Ohio St., 365. In that case the general assembly of Ohio had undertaken to classify certain cities, particularly the city of Elyria, and then to provide for a certain form of government for such legislatively classified cities. This court held that the act of the legislature in the matter of clas *138 sification of cities, under the 18th Amendment, was unconstitutional. The following judges concurred in that opinion: Nichols, C. J., Jones, Matthias, Johnson, Wanamaker and Robinson, JJ. Judge Matthias, at page 371, of the opinion, uses this course of reasoning:
“The constitution adopted in 1912 did not leave to the legislature the matter of classification of municipalities. The constitutional convention retained the provision that 'General laws shall be passed to provide for the government of cities and villages,’ substantially as in the former constitution, but in furtherance of its manifest and clearly expressed purpose to take from the legislature the power theretofore exercised by it relative to the government of the municipalities of the state and to confer such powers of local self-government directly upon the municipalities themselves the constitution provides in Section 1, Article XVIII, that 'Municipal corporations are hereby classified into cities and villages. All such corporations having a population of five thousand or over shall be cities; all others shall be villages. The method of transition from one class to the other shall be regulated, by law’.”
It is to be exercised within constitutional limitations by such agency.
In this case the sovereign people saw fit not to exercise the power themselves, under Sections 3, 4 and 5. That would be impracticable. But they delegated that power to the sovereign people of the municipality, through the muriicipal government agencies, to be determined by the people them *139 selves; and, when this express grant of power was made to the municipality, by the doctrine announced in the Elyria case, supra, “It thereby withheld that subject absolutely and entirely from legislative control and permitted it to be no longer a matter of statutory jurisdiction.”
In short, what had been, delegated to the municipality had been denied to the state.
This express grant of the people of the state to the people of the municipality is therefore clearly and conclusively an exclusive grant, not only of “all powers of local self-government,” in the general sense, but specifically of the power to contract for the product or service of any public utility furnishing a product or service to the municipality or its inhabitants; and neither the legislature or any branch of the government other than the grantee of the constitution may alter, modify, or in any wise exercise such power.
If it be otherwise, what the principal, the people, do, may at any time be undone by the agents of the people, the legislature, the courts, or a board or commission of the state.
Our judicial duty to support and sustain these several provisions of the state and national constitutions is specifically required by our oaths. These oaths, however, do not require us to support any decision of any court or any legislative act of the general assembly of the state of Ohio, especially where the same is repugnant to our organic law, our constitution.
We have applied this principle to safeguard the jurisdiction of our court. (Cincinnati Polyclinic *140 v. Balch, 92 Ohio St., 415; Wagner v. Armstrong, 93 Ohio St., 443.) We have applied this principle to safeguard the right of candidates for public office, and the right of the people to elect them to the same. (Fulton v. Smith, 99 Ohio St., 230.) We have applied this principle with reference to the constitutional classification of cities. (City of Elyria v. Vandemark, supra.) We have also applied it in numerous other cases involving essentially the same principle. Why should we not apply this same principle in safeguarding the rights of the people, three million and more of them, in our municipalities, who use the service of the public utility companies, pay for said service, police said service, and are solely and directly affected by such service by virtue of the fact that they are a municipal corporation?
I have not thought it worth while to deal with the various statutory provisions involved in this case, further than heretofore mentioned. A statute cannot exceed the constitutional delegation of power, nor a constitutional denial of power. It is therefore to the constitution we must look for the people’s rights as well as for those of the telephone company.
Much has been said in behalf of the telephone companies about “bartering away” the police power; that the state may not do such a thing. This, after all, is only a play upon words, because it is self-evident that the state and all of its political agencies must be held to faithfully and fully observe all its contractual obligations, and things have come to a pretty pass when the police power *141 may be successfully invoked to enable a party to escape or avoid any portion of a just obligation under a contract validly entered into, as this contract was, and as all parties believed it to be and operated under it for more than fifteen years.
These two constitutional provisions, one national, the other state, are so obvious and obligatory upon this court, that it is difficult to understand how there could be any division of opinion about their plain and potential application.
This drawing of distinctions on the surface by courts, where there are no differences in substance, is the proximate cause of much of the confusion and uncertainty of the law, much of the confusion and uncertainty as to constitutions and courts. We will never get back to the safeguard of constitutional government until we' permit to the full the natural and ordinary meaning of the people’s language in the operation of the people’s law. What the constitutions prohibit, courts must not permit by any legal legerdemain.